```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION

GREG DUGAS,

              Plaintiff,

    vs.                              Civil Action 2:15-CV-67
                                     Judge Sargus
                                     Magistrate Judge King
BRIAN WITTRUP,

              Defendant.
```

## ORDER AND
## REPORT AND RECOMMENDATION

Plaintiff, an inmate currently incarcerated at the Chillicothe Correctional Institution ("CCI"), brings this action under 42 U.S.C. § 1983 against Brian Wittrup,[1] Chief of the Bureau of Classification for the Ohio Department of Rehabilitation and Correction ("ODRC"), alleging that defendant was deliberately indifferent to a serious risk of harm to plaintiff's safety in violation of plaintiff's constitutional rights.  This matter is now before the Court on plaintiff's *Motion for Emergency Filing Pursuant to the Prison Litigation Reform Act's (PLRA) 'Emminent [sic] Danger Doctrine'*, ECF 2 ("*Motion for Temporary Restraining Order*") and *Motion to Compel*, ECF 10.  For the reasons that follow, the *Motion to Compel* is **DENIED** and it is **RECOMMENDED** that the *Motion for Temporary Restraining Order* be **DENIED**.

---

[1] The Ohio Attorney General has made an appearance on behalf of defendant Wittrup who has not yet been served with process.  *The State of Ohio's Response to Plaintiff's Motion for Temporary Restraining Order*, ECF 5 ("*Response*"), p. 1 (citing O.R.C. § 109.361).

I. **ODRC CLASSIFICATION SYSTEM AND PROTECTIVE CONTROL**

The ODRC maintains a classification level system "that creates a process for the classification of inmates according to their security risk." *Response*, p. 1 (quoting ODRC Department Policy No. 53-CLS-08). *See also* ODRC Department Policy No. 53-CLS-08, *available at* http://www.drc.ohio.gov/web/drc_policies/drc_policies.htm; *United States v. Newsome*, 2014 U.S. Dist. LEXIS 150659, at *2-3 (S.D. Ohio Oct. 23, 2014) ("Public records and government documents, including those available from reliable sources on the Internet, are subject to judicial notice."). The assignment of inmates to institutions considers "the needs of the offender, the safety of persons in the institution, and the operational stability of the institution." *Id*. An inmate may be immediately transferred to a control prison or control unit under the following circumstances:

- a. The inmate meets the criteria for a Level 4 or Level 5 classification as set forth in Department Policies 53-CLS-01, Inmate Security Classification Levels 1 through 4; 53-CLS-04, Level 5 Classification; and 53-CLS-06, Inmate Security Classification Level 4 at OSP [the Ohio State Penitentiary].

- b. The inmate's continued presence in the current institution has a detrimental effect on the safety, security, or good order of the institution; and,

- c. The detention of the inmate in a segregation unit at the current institution will not be sufficient to address the needs of the institution.

ODRC Department Policy No. 53-CLS-08, (VI)(A)(1). Once granted protective control status, inmates are transferred to the Allen Oakwood Correctional Institution ("Allen Oakwood"), the only state institution with a protective control unit. *Affidavit of Paul*

*Arledge*, ¶ 8 *("Arledge Affidavit")*, attached as Exhibit 1 to the *Response*.[2]

The ODRC also maintains procedures for physically separating particular inmates "when there is reason to believe that the inmates could be harmed by being in close proximity to one another, and/or their presence together could jeopardize the security and safety of the institution, staff, and/or other inmates." *Response*, p. 2 (quoting ODRC Department Policy No. 53-CLS-05). *See also* ODRC Department Policy No. 53-CLS-05(V), *available at* http://www.drc.ohio.gov/web/drc_policies/drc_policies.htm. The separations may be "institution separations" or "local separations." *Id*. at (VI). An institution separation is "[a]n order wherein two or more inmates are not assigned to general population in the same institution due to a concern for the safety and security of the institution, staff and/or other inmates." *Id*. at (IV). A local separation is "[a]n order wherein two or more inmates are not permitted to be assigned to the same living and/or work area, and are not permitted simultaneous involvement in the same recreational or leisure time activities to ensure they are not in close proximity with one another." *Id*.

An inmate may also request a transfer to another facility. *Response*, p. 2 (citing ODRC Department Policy No. 53-CLS-09). *See also* ODRC Department Policy No. 53-CLS-09, *available at*

---

[2] Mr. Arledge is an investigator at CCI who is familiar with the protective control request investigation process. *Id*. at ¶¶ 5-6.

http://www.drc.ohio.gov/web/drc_policies/drc_policies.htm.[3] However, "[a]n inmate has no right to receive a transfer and one may only be granted when it serves a legitimate penological reason." *Id*. at (VI)(A)(3). More specifically, the ODRC may transfer inmates to other facilities

> in order to encourage and support visiting with pro-social members of the general community, to participate in programs advertised as open for enrollment at the discretion of Managing Officers, for OPI job assignment, and/or to address specific criminogenic needs. This policy applies solely to inmate initiated transfers and an inmate may only request a transfer for the reasons outlined in this policy.

*Id*. at (V). Inmates may appeal the denial of a transfer request to the Bureau of Classification. *Id*. at (VI)(A)(9).

**II. FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY**

In October 2014, while plaintiff was incarcerated at the Belmont Correctional Institution ("BeCI"), an inmate[4] who was allegedly part of a gang known as the "Bloods," demanded that plaintiff hold drugs for him. *Complaint*, ECF 1, pp. 4-5. After receiving the drugs, which had a "prison street value of three-thousand dollars[,]" plaintiff flushed them down the toilet. *Id*. at 5. Plaintiff later testified against the inmate. *Id*. The inmate's security level was increased and he was transferred to a higher security facility. *Id*. Plaintiff contends that, as a result of his testimony against a gang member and to protect him against retaliatory attacks from fellow gang members at

---

[3] This policy does not apply to inmates with classification Levels 4 and 5. *Id*. at (III).
[4] Plaintiff refers to this inmate as "McCloud," *see*, *e.g.*, *Complaint*, ECF 1, pp. 4-5, but defendant identifies this inmate as "McClough, 623851 aka Wheezie." *Response*, p. 3 n.2.

4

BeCI, he was granted protective control status[5] and was transferred to CCI. *Id*. at 5-6, 12, 14. Once he arrived at CCI, plaintiff was placed in the general population. *Id*. On November 8, 2014, five days after his arrival at CCI, plaintiff alleges that the following incident occurred:

> [W]hile at the Chillicothe facilities' game room (pool hall), while playing pool, three black inmates walked to the door of the game room asking for "Missouri" – which was Dugas' known nickname at the Belmont facility – but Dugas had not told anyone at the Chillicothe facility that his home state or his nickname was "Missouri," so fortunately for Dugas he was not identified by the three black inmates.
>
> When they left, Dugas casually asked the individual he was playing pool with who they were and the individual he was playing pool with said they were Blood "enforcers" and that he didn't know who "Missouri" was but he wouldn't want to be "Missouri."

*Id*. at 15. Plaintiff's subsequent refusal to lockdown in his regular assigned area was construed as a request for protective control. *Id*. at 15-16. Plaintiff provided a sworn statement "of the events" to CCI's protective control committee in support of his request. *Id*. at 16. According to plaintiff, he also advised CCI Warden Jenkins and defendant Wittrup of the following:

> [W]hile he [plaintiff] was at the Belmont facilities' segregation unit (in protective custody status) that the Blood gang's "shot-callers" were actively attempting to carry out a retaliation there, by attempting to order Dugas' cell mates to assault him; Dugas' cell mates at the time were not "under" the Bloods' hierarchal command and fortunately for Dugas did not carry out the assault, but the entire time Dugas was at Belmont segregation unit in a protective custody status awaiting his transfer to Chillicothe, Blood gang members repeatedly threatened Dugas

---

[5] According to defendant, however, "Dugas was denied protective control . . . and was granted a transfer to CCI from Belmont in lieu of protective control." *Arledge Affidavit*, ¶ 7.

> that they would "send" for him on any prison yard in the State of Ohio he went to.

*Complaint*, p. 17.

Case Manager Shane Stevens investigated plaintiff's allegations and denied plaintiff's request to be placed in protective control at CCI. *Arledge Affidavit*, ¶ 11.

> According to the Investigation Report, Dugas's request to be placed in protective control was denied because there was no evidence found to support Dugas's allegation that there were inmates at CCI looking for him; Dugas was unable to provide any names of the inmates with whom he was playing pool or the names of the inmates looking for him at CCI. Further, Dugas has a history of attempting to secure transfers to other prisons by collecting rule violations in order to secure an individual cell, rather than being placed in the dorms inhabited by the general population.

*Id*. at ¶ 12. On administrative appeal from that decision, defendant Wittrup likewise denied plaintiff's request for protective control. *Complaint*, p. 16.

On January 7, 2015, plaintiff filed the *Complaint* under 42 U.S.C. § 1983. Although plaintiff's *Complaint* and supporting declaration are difficult to follow, he appears to allege that defendant Wittrup was deliberately indifferent to a substantial risk of serious harm to plaintiff when he denied plaintiff's request for protective control status and incarcerated plaintiff with the CCI's general population. Plaintiff also alleges that the State of Ohio's classification and transfer policies are flawed, creating unsafe environments in its facilities. Plaintiff specifically alleges that he faces

> not only the general threat of being attacked, injured, killed or other irrepairable [sic] harm from Ohio's overly-dangerous level two facilities, but otherwise and further faces an articulable, authentic, and particularized threat

6

>of a serious and potentially life-threatening gang retaliation

because of his destruction of $3,000.00 worth of drugs belonging to the Bloods gang.  *Complaint*, pp. 42-43.

On the same day that he filed the *Complaint*, plaintiff also moved for a temporary restraining order, seeking an order directing defendant Wittrup to re-classify plaintiff to protective control status and to transfer plaintiff to Allen Oakwood until plaintiff's current sentence expires in approximately October 2015.  Defendant has filed a memorandum in opposition to plaintiff's *Motion for Temporary Restraining Order. Response.* Plaintiff has filed a reply in support of the motion.  *Plaintiffs' [sic] Reply to the State of Ohio's Position on the TRO*, ECF 9 ("*Reply*").  Plaintiff has also filed a supplemental memorandum.  *See Supp. Memo. on TRO*, ECF 12 ("*Supplemental Memorandum*").[6]

**III. STANDARD**

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief if he believes that he will suffer irreparable harm or injury without such relief.  Fed. R. Civ. P. 65(a), (b).  A temporary restraining order relates only to restraints sought without notice to the adverse party.  *Id.*  Where, as in the case presently before the Court, the adverse party has been given

---

[6] This Court's local rules do not permit the filing of such additional memoranda "except upon leave of court for good cause shown."  S.D. Ohio Civ. R. 7.2(a)(2).  Although plaintiff has not moved for leave or established good cause for his proffered *Supplemental Memorandum*, the Court will nevertheless consider this filing in considering the *Motion for a Temporary Restraining Order*.

notice of the request, the application is properly treated as one for a preliminary injunction. *See id.; Rios v. Blackwell*, 345 F. Supp. 2d 833, 835 (N.D. Ohio 2004) ("As long as there is notice to the other side and an opportunity to be heard, the standard for a preliminary injunction is the same as that for a temporary restraining order.").

The decision whether to grant a request for interim injunctive relief falls within the sound discretion of the district court. *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). An injunction, however, is an extraordinary remedy that should be granted only after a court has considered the following four factors:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997)). These four considerations are factors to be balanced. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985); *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001). However, a preliminary injunction should not issue where there is simply no likelihood of success on the merits. *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). "Moreover, a district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction

if fewer factors are dispositive of the issue." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citing *DeLorean*, 755 F.2d at 1228). The movant bears the burden of establishing that "the circumstances clearly demand" this extraordinary relief. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary*, 228 F.3d at 739).

Finally, where a plaintiff seeks an order enjoining a defendant prison official, a court must take care and recognize the special nature of a prison setting. *Schuh v. Michigan Dep't of Corr.*, No. 1:09-cv-982, 2010 U.S. Dist. LEXIS 96812, at *4 (W.D. Mich. July 26, 2010), *adopted and approved by Schuh v. Michigan Dep't of Corr.*, No. 1:09-cv-982, 2010 U.S. Dist. LEXIS 96851 (W.D. Mich. Sept. 16, 2010) (denying inmate's request for interim injunctive relief be denied). *See also Scott v. Mathena*, No. 7:12-cv-469, 2012 U.S. Dist. LEXIS 147682 (W.D. Va. Oct. 15, 2012) (denying inmate's motion for temporary restraining order directing defendant prison officials to change plaintiff's security classification and access to rehabilitative programming); *James v. Randle*, No. 10-cv-78, 2010 U.S. Dist. LEXIS 85171 (S.D. Ill. Aug. 19, 2010) (denying inmate's motion for interim injunctive relief directing defendant prison officials to, *inter alia*, place the plaintiff inmate in protective custody).

**IV. DISCUSSION**

After considering the relevant evidence and the arguments of the parties, the Court concludes that plaintiff has failed to establish a strong likelihood of success on the merits. Plaintiff brings his

claim of deliberate indifference pursuant to 42 U.S.C. § 1983, which provides in pertinent part:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. To succeed on a claim for a violation of § 1983, a plaintiff must establish that (1) a person (2) acting under color of state law (3) deprived him of his rights secured by the United States Constitution or its laws. *See Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). Because § 1983 is a method for vindicating federal rights, and is not itself a source of substantive rights, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Section 1983 merely provides a vehicle for enforcing individual rights found elsewhere and does not itself establish any substantive rights. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

In the case presently before the Court, plaintiff alleges that defendant was deliberately indifferent to plaintiff's safety in violation of plaintiff's rights under the Fourteenth Amendment to the United States Constitution. *See*, *e.g.*, *Complaint*, pp. 18-21, 27-29, 43; *Declaration of the Plaintiff*, ECF 1-1 ("*Plaintiff's Declaration*"), p. 12; *Reply*, p. 19; *Supplemental Memorandum*, pp. 7-9. However, it is the Eighth Amendment's deliberate indifference standard that applies

10

to convicted prisoners; the Fourteenth Amendment's due process clause applies only to pretrial detainees.  *Lanman v. Hinson*, 529 F.3d 673, 680-81 (6th Cir. 2008).  Because plaintiff is a convicted prisoner in the custody of ODRC at all times relevant to the *Complaint, Complaint*, pp. 1-2; *Arledge Affidavit*, ¶¶ 7, 9, 13, it is the Eighth Amendment that applies to plaintiff's claim.

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks and citation omitted).  *See also Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).  To establish liability under the Eighth Amendment for defendant's alleged failure to protect plaintiff from inmate violence, plaintiff must show that defendant was deliberately indifferent "to a substantial risk of serious harm."  *Farmer*, 511 U.S. at 828.  Deliberate indifference contains both an objective and subjective component and the plaintiff bears the burden of demonstrating these components.  *Farmer*, 511 U.S. at 833, 837; *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001)).  Turning first to the objective component, while "[i]n the abstract, one prison inmate's threat to the health and safety of another inmate is 'sufficiently serious' to satisfy" the objective component, a "general concern" about safety from unidentified inmates does not satisfy this component.  *Williams v. McLemore*, No. 05-2678, 247 F. App'x 1, at *9 (6th Cir. June 19, 2007) (citing *Gant v. Campbell*, No. 00-5639, 4 F. App'x 254, at *256 (6th Cir. Feb. 6,

11

2001)). *See also Bogan v. Brunsman*, No. 1:11-cv-259, 2013 U.S. Dist. LEXIS 12416, at *16 (S.D. Ohio Jan. 30, 2013) ("Thus, identification of a prisoner's enemies is critical to the prison's ability to protect a prisoner because it is the prison officials, not the prisoner, who must determine whether there is a substantial risk of harm that warrants a transfer or other action."), *adopted and affirmed by Bogan v. Brunsman*, No. 1:11-cv-259, 2013 U.S. Dist. LEXIS 26762 (S.D. Ohio Feb. 27, 2013).  In the case presently before the Court, plaintiff fails to identify a threat to his safety from any specific inmate. Instead, he alleges only that "three black inmates" inquired for "Missouri" and that "the individual he was playing pool with said they [the three African-American inmates] were Blood 'enforcers' and that he didn't know who 'Missouri' was but he wouldn't want to be 'Missouri.'" *Complaint*, p. 15.  Plaintiff's allegation of threat is based on rank speculation. Moreover, plaintiff has failed to identify either the alleged Blood "enforcers" or the other inmate who was allegedly present for this encounter. *Id*.  Indeed, an investigation into these allegations revealed "no evidence . . . to support Dugas's allegation that there were inmates at CCI looking for him[.]"  *Arledge Affidavit*, ¶ 12.  Plaintiff has alleged nothing more than a generalized concern for his safety from unidentified inmates.  Under these circumstances, plaintiff has failed to meet the objective prong of his deliberate indifference claim.

Furthermore, plaintiff has not satisfied the subjective prong of his claim, which requires that he show that defendant knew of and

12

disregarded an excessive risk to plaintiff's safety, *i.e.*, that defendant "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Moreover, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 830 (stating that a "prison official's duty under the Eighth Amendment is to ensure 'reasonable safety'") (citation omitted)).  In the case presently before the Court, plaintiff has failed to show that defendant was aware of facts showing that plaintiff faced a substantial risk of serious harm or that defendant drew such an inference.  As set forth above, CCI conducted an investigation following plaintiff's request to be placed in protective control but discovered no evidence of an actual, particularized threat to plaintiff's safety.  *Arledge Affidavit*, ¶¶ 11-12 (averring further that plaintiff "was unable to provide any names of the inmates with whom he was playing pool or the names of the inmates looking for him at CCI").  Moreover, plaintiff has been in segregation at CCI since November 8, 2014, and "has not been harmed and does not claim that he has been harmed since his arrival at CCI on November 3, 2014." *Id*. at ¶¶ 13-14.  Therefore, nothing in the present record establishes either that defendant was aware that plaintiff faced a substantial risk of serious harm or failed to respond reasonably to any such risk. *See Farmer*, 511 U.S. at 830, 837.  *Cf. Gibson v. Foltz*, 963 F.2d 851, 854

13

(6th Cir. 1992) ("The fact that the defendants knew that SPSM housed many violent prisoners and that prison violence did occur is not sufficient to constitute deliberate indifference."). Accordingly, plaintiff has failed to establish a strong likelihood of success on the merits.[7] Under these circumstances, plaintiff's request for interim injunctive relief is without merit. *See Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003); *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors [is] given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.") (citing *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1037 (6th Cir. 1995)) (emphasis added).[8]

**VI.   *MOTION TO COMPEL***

Plaintiff has filed a motion to compel the production of certain information. ECF 10. It does not appear that plaintiff has actually served an initial discovery request on defendant through his counsel. *Id*. Plaintiff is **REMINDED** that original discovery requests are to be served on the parties through their counsel. Plaintiff may file a

---

[7] The Court notes further that, although plaintiff seeks an order directing defendant to re-classify him to protective control status and to transfer him to Allen Oakwood, inmates generally have no protected liberty interest in a specific security classification or assignment to a particular prison cell or institution. *See*, *e.g.*, *Sandin v. Conner*, 515 U.S. 472, 486-87 (1995); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Ortega v. United States Immigration & Customs Enforcement*, 737 F.3d 435, 438-39 (6th Cir. 2013); *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005).

[8] Plaintiff at times refers to his request for "summary judgment." *See*, *e.g.*, *Reply*, pp. 18-20; *Supplemental Memorandum*, pp. 8-9. To the extent that plaintiff intends that his motion be construed as a motion for summary judgment under Fed. R. Civ. P. 56, that motion is without merit for the same reasons as are articulated above.

discovery-related motion only after it appears that a discovery dispute, which the parties are unable to resolve, has arisen.  The *Motion to Compel* is therefore without merit.

**WHEREUPON**, plaintiff's *Motion to Compel*, ECF 10, is **DENIED**.

It is **RECOMMENDED** that plaintiff's *Motion for Emergency Filing Pursuant to the Prison Litigation Reform Act's (PLRA) 'Emminent [sic] Danger Doctrine'*, ECF 2, be **DENIED**.[9]

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation.* *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States*

---

[9] Although he failed to file a separate motion, plaintiff apparently seeks leave to amend his complaint to add two new defendants and to modify his request for damages.  *See Reply*, pp. 11-14.  The Court will address the request for leave to amend in a separate decision.

*v. Walters*, 638 F.2d 947 (6th Cir. 1981).


January 30, 2015                                          *s/Norah McCann King*
                                                           Norah McCann King
                                                      United States Magistrate Judge